UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-----------------------------------------------------------------

THE IDLER COMPANY, INC.,

                                                     Civil Action No.
                        Plaintiff,       3:09-cv-698 (JCH/HBF)

    -v-

SPLINTERNET HOLDINGS, INC., VIDIATION,
INC., VIDIATION, LLC, FRANK O'CONNOR and
JAMES C. ACKERLY,

                                               May 21, 2009
                        Defendants.
-----------------------------------------------------------------

## AMENDED COMPLAINT

Plaintiff The Idler Company, Inc. ("Idler"), by its attorneys, alleges as follows:

### Nature of the Action

1.      This is an action for various securities law violations, as well as for breach of contract, rescission, fraud, and unjust enrichment, brought on behalf of Idler in connection with an offering of the equity securities of Vidiation, LLC and Vidiation, Inc. (together, "Vidiation") and an offering by Splinternet Holdings, Inc. ("Splinternet") of Splinternet common stock pursuant to a merger of a wholly-owned subsidiary of Splinternet with and into Vidiation, Inc., as a result of which Vidiation, Inc. became a wholly-owned subsidiary of Splinternet.

2.      On or about May 18, 2007, Idler entered into an agreement with Vidiation, LLC to purchase two units of Vidiation, LLC for $100,000, each unit consisting of 40,000 shares of "common stock."  Vidiation, Inc. subsequently acquired the assets of Vidiation, LLC in exchange for shares of common stock of Vidiation, Inc.  Splinternet and Vidiation, Inc. are liable for the obligations of Vidiation, LLC under this contract as successors in interest and alter egos of Vidiation, LLC and by virtue of the actual and/or implied assumption of the

1

contractual obligations of Vidiation, LLC in connection with the merger of Vidiation, LLC with and into the subsidiary of Splinternet.

3.     As alleged herein, all Defendants were engaged in a common scheme, and conspired, to defraud Idler.

4.     Vidiation and Splinternet each offered and sold its equity securities to Idler by means or instrumentalities of interstate commerce and the mails, in the form of written and oral communications, and (1) made untrue statements of material fact; (2) omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading; and (3) engaged in acts, practices, and courses of business that operated as a fraud and deceit upon Idler.

5.     Vidiation and Splinternet sold securities in the United States in violation of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") and the regulations of the Securities and Exchange Commission ("SEC") thereunder, and in violation of various state securities laws and regulations.

6.     Frank O'Connor and James C. Ackerly participated actively and directly in such securities law violations, and as directors, officers, and controlling persons of Vidiation and Splinternet are personally liable for such securities laws violations.

## Parties

7.     Plaintiff Idler is a corporation organized and existing under the laws of the Province of Ontario, Canada, with its principal place of business in Toronto, Canada.  During the relevant time period, Manny Drukier served, and continues to serve, as the President of Idler.

8.      Defendant Splinternet Holdings, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Norwalk, Connecticut.  Splinternet is a holding company whose wholly-owned subsidiaries include Vidiation, Inc., which does business as Defentect.

9.      Defendant Vidiation, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Norwalk, Connecticut. Vidiation, Inc. is a wholly-owned subsidiary of Splinternet, and does business as Defentect.

10.     Defendant Vidiation, LLC is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in Lake Zurich, Illinois.

11.     Defendant Frank O'Connor is a resident of the State of Illinois.  Mr. O'Connor was a founder of Vidiation, LLC and served as its Co-President and Chief Executive Officer. He also serves, or has served, as Chairman, President, and Chief Executive Officer of Vidiation, Inc.

12.     Defendant James C. Ackerly is a resident of the State of Connecticut.  Mr. Ackerly served as the Chief Financial Officer of Vidiation, LLC and Vidiation, Inc.  Mr. Ackerly currently serves as the President and Chief Executive Officer of Splinternet.

**Jurisdiction and Venue**

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under §§ 12 and 15 of the Securities Act (15 U.S.C. §§ 77l & 77o), and under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)).  For the claims arising under the Securities Act and the Exchange Act, this Court has jurisdiction pursuant to § 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to § 27 of the Exchange

Act (15 U.S.C. § 78aa), respectively. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

14.     Alternatively, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship among the parties, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, § 22 of the Securities Act (15 U.S.C. § 77v), and § 27 of the Exchange Act (15 U.S.C. § 78aa).

## Factual Allegations

16.     In April 2005, the U.S. Department of Homeland Security formed a Domestic Nuclear Detection Office to address the threat of a "dirty bomb," which could detonate a conventional explosive to spread radioactive material across a small state.

17.     Vidiation, LLC was formed in 2006 to market advanced homeland security technologies as a defense against terrorism.

18.     Soon after its formation, Vidiation, LLC entered into an agreement with Advanced Fuel Research, Inc. ("AFR"), based in East Hartford, Connecticut, to develop the Vidiation-Radiation Analytics Detection System (V-RADS™).

19.     At the time, Vidiation, LLC stated that V-RADS is a:

"revolutionary, proven gamma radiation detection technology that identifies radioactive materials by analyzing streams of surveillance video and is an important new line of defense against the unlawful possession or transport of source materials and, ultimately "dirty bomb" attacks. V-RADS uses information generated when high-energy gamma rays and particles interact with the image sensors of video cameras; its proprietary algorithms and expert system analyze data and identify radiation that may pose a security threat.
V-RADS combines passive surveillance and active alerts in its subscription-based software, and is built to avoid the common pitfalls of 'false positive' alerts. V-RADS is easily integrated with the full complement of video surveillance systems, from stand-alone to enterprise-level solutions, and is designed to 'layer' into these existing CCTV systems with no modifications to customer's video

cameras—an install base of some 26 million in the U.S. alone. The more pervasive the deployment of V-RADS™ across the vast number of existing video surveillance networks, the higher the degree of security society achieves against the 'dirty bomb' threat."

20.     In early 2007, Mr. Drukier's son, Gordon, was appointed a senior scientist at Vidiation, LLC.

21.     During conversations with his son in early 2007, Mr. Drukier learned that Vidiation, LLC was in the process of trying to raise capital and that Mr. O'Connor was the officer of Vidiation, LLC who was responsible for the securities offering.

22.     Between March and May 2007, Mr. Drukier on Idler's behalf had several conversations with Mr. O'Connor on Vidiation, LLC's behalf about the radiation-detection technology being developed by Vidiation, LLC.

23.     In these conversations, Mr. O'Connor represented that AFR had applied for a patent on the radiation-detection technology in the United States and other countries, and that he had been introduced to AFR as a third-party with the potential to raise the money necessary to bring the product to market.

24.     Mr. O'Connor also explained in these conversations that once AFR and he had decided to work together, he was responsible, among other things, for setting up a company that would raise the money necessary to commercially launch the product, present the product at exhibitions, and prosecute the patent applications.

25.     In particular, Mr. O'Connor said that Vidiation, LLC intended to raise $4 million, but that it had been having trouble raising the money.  He said that potential investors seemed interested but just were not following through by sending in their money.  As he put it, they "had the tiger by the tail."

26.     During these conversations, Mr. O'Connor also said that he would provide Idler with additional information regarding Vidiation LLC and the radiation-detection technology.

27.     In approximately April or May 2007, Mr. Drukier on Idler's behalf received a Confidential Private Placement Memorandum dated as of February 1, 2007 describing an offering of up to $4 million of units consisting of "common stock" of Vidiation, LLC (the "February 2007 PPM"), a copy of which is attached as Exhibit A.

28.     The February 2007 PPM confirmed several material representations that had been made orally by Mr. O'Connor to Mr. Drukier.  Specifically, it stated that in November 2006, Vidiation, LLC had entered into an agreement with AFR for the "exclusive right to develop and market products related to the Vidiation Technology."

29.     The February 2007 PPM described Vidiation, LLC as a "Nevada corporation" as of the date of "this Offering" that was undergoing a recapitalization in order to raise money.

30.     It also described Vidiation, LLC as a "development stage company offering to sell up to 80 units (each, a 'Unit'), each Unit consisting of (i) 40,000 shares of the common stock [sic]. . . of a privately held company.  The purchase price per Unit is $50,000.  [Vidiation, LLC] is offering . . . to sell a minimum of 40 Units and a maximum of 80 Units."

31.     Regarding its ownership structure, Vidiation, LLC stated in the February 2007 PPM that before the offering it was owned 50% by AFR and 50% by Vidiation, LLC's directors and executive officers.  After the offering, and depending on the extent of the subscriptions received and accepted, Vidiation, LLC stated that it would be owned between about 24% to 39% by outside investors.

32.     In the February 2007 PPM, Vidiation, LLC represented that the proceeds from the offering would be used for research and development activities regarding Vidiation, LLC's

technology. It specifically stated that it would not pay off indebtedness to "early development partners" unless more than $3,000,000 of gross proceeds were received in the offering.

33.     Vidiation, LLC also stated in the February 2007 PPM that it is "committed to raising the capital to build and market the products and is indebted to AFR in the amount of $500,000 for license and patent rights." It explicitly stated that $300,000 of the $500,000 would be held in escrow "until AFR successfully prosecutes and secures the patent rights in Europe, Japan and Israel."

34.     The February 2007 PPM stated that until Vidiation, LLC received and accepted subscriptions for 40 units (the minimum offering), "subscription payments shall be held in escrow" and that the escrow "shall continue" until the closing of the minimum offering.

35.     The escrow provisions explicitly stated that subscription payments shall be returned, without interest or deduction, to any subscriber whose subscriptions are rejected or who failed to reconfirm their subscriptions following receipt of a supplement to the offering memorandum.

36.     In the section of the February 2007 PPM explaining the suitability requirements and the subscription procedures, Vidiation, LLC represented that "[a]ll funds received from subscribers for the Units will be held in a special non-interest bearing escrow account at Signature Bank (the 'Escrow Agent') for the benefit of such subscribers until a closing or earlier termination of this Offering."

37.     Though the February 2007 PPM represented that the offering would close on or before April 15, 2007, it stated that Vidiation, LLC could extend the offering for up to 180 days without notice of prospective subscribers. It defined the "Termination Date" as the date on which the offering terminated any time on or before April 15, 2007, and up to 180 days after

April 15, 2007.  Significantly, however, it also represented that if Vidiation, LLC had not received and accepted at least 40 units by the termination date, Vidiation, LLC was required to instruct the Escrow Agent to return to subscribers the full subscription amounts, without interest.

38.    Mr. Drukier was particularly interested in and relied upon the oral representations of Mr. O'Connor and the written representations to the same effect in the February 2007 PPM that the offering proceeds would be used for research and development and that subscription payments would be held in escrow until completion of the sale of at least 40 units before the termination date.

39.    In the first two weeks of May 2007, Mr. O'Connor told Mr. Drukier in a telephone conversation that if Idler sent a check to Mr. O'Connor in the amount of $100,000 that he would hold the check until Mr. Drukier received subscription documents from Mr. O'Connor and returned the signed subscription documents to Mr. O'Connor.

40.    Based upon those assurances and the statements in the February 2007 PPM, Idler sent Mr. O'Connor a check dated May 18, 2007 in the amount of $100,000.00 ($US) made payable to Vidiation, LLC for 80,000 shares (2 units) in Vidiation, LLC.

41.    Mr. O'Connor received Idler's check, but in breach of his assurances, obligation, and the agreement to hold the check until signed subscription documents were received from Idler, Vidiation, LLC deposited Idler's check on June 14, 2007.

42.    Neither Mr. O'Connor nor any other representative of Vidiation, LLC ever sent Mr. Drukier a subscription agreement for Idler to sign and return to Vidiation, LLC before cashing Idler's check.

43.     Between August and October 2007, Mr. Drukier spoke to Mr. O'Connor by telephone and in that conversation Mr. O'Connor stated that to date he had raised only about $1 million, but explained that he was "working hard" and was taking time "off for a well-deserved holiday in Mexico."

44.     By October 2007, Vidiation, LLC still had:  (1) not received subscriptions for the minimum offering of 40 units; (2) not provided notice to investors that it had extended the offering period beyond the termination date set in the February 2007 PPM; and (3) not returned the subscription funds to Idler according to the provisions of the February 2007 PPM.

45.     Indeed, on October 29, 2007, Vidiation, LLC publicly announced that it had engaged Cyrus Strategies to help secure up to $4 million in equity funding to bring its product to market.  In the announcement, Mr. O'Connor was quoted as saying, "Now the challenge is to quickly raise enough capital to deploy the software across a wide range of homeland security applications."

46.     By December 2007—nearly six months after Vidiation, LLC had deposited its subscription check—Idler had not yet received a subscription agreement or other documentation relating to the subscription.

47.     Accordingly, on December 2, 2007, Mr. Drukier sent an email to Mr. O'Connor in which he stated in full, "Frank, Status Quo since May is unacceptable.  Remit by FedEx share certificate or equivalent . . . or refund entire $100,000 plus interest.  Manny Drukier."

48.     Mr. O'Connor responded to Mr. Drukier by email within a couple hours.  Mr. O'Connor's email stated in full, "This is underway.  We spent a good deal of time on this again on Friday. . . i [sic] will call you to review all the plans and then document to you in writing."

49.     Later that month, Vidiation, LLC and Splinternet announced that they had entered into a cross-licensing and selling agreement.

50.     In or about January 2008, Mr. Drukier learned from Mr. O'Connor that Vidiation, LLC was in the process of changing to a corporation to be known as Vidiation, Inc., and that Vidiation, Inc. would issue shares of its common stock to Vidiation LLC members.

51.     Upon information and belief, Vidiation, LLC knew well before January 2008 that it planned to change its organizational status.

52.     Though Vidiation, LLC and Vidiation, Inc. were organized as separate corporate entities, they were one in the same.  Upon information and belief, they shared the same officers, directors, and employees, they had a common ownership, they shared control, and they comingled assets.  Ultimately, Vidiation, LLC transferred all of its assets and liabilities to Vidiation, Inc.

53.     On January 17, 2008, Mr. Drukier directed Mr. O'Connor to issue the shares in name of "The Idler Company Inc."

54.     In the meantime, on February 7, 2008, Vidiation, Inc. entered into an Agreement and Plan of Merger with Splinternet.

55.     Vidiation, Inc., however, knew well before February 2008, and as early as May 2007, that it planned to merge with a publicly traded shell company.  Upon information and belief, this publicly traded shell company was Splinternet.

56.     Upon information and belief, Vidiation, LLC, Vidiation, Inc., and Splinternet are *alter ego* entities.  They share common officers, directors, and employees, they have a common ownership, they share control, and they comingle assets.  Vidiation, Inc. and Splinternet share office space at the same building in Norwalk, Connecticut.  Due to the

domination of finances, policies, procedures, and decision-making, Vidiation and Splinternet in essence have no separate mind, no existence on their own, and are merely business conduits for each other.

57.     By email dated February 22, 2008, Vidiation, Inc. informed Mr. Drukier that "Vidiation has incorporated" and that Vidiation, LLC units were being "reissued" as shares of common stock of Vidiation, Inc.  Vidiation, Inc. requested that Mr. Drukier sign and return a Vidiation, Inc. subscription agreement.

58.     By the time Vidiation, LLC shares were reissued as Vidiation, Inc. shares, Vidiation, LLC had not received and accepted subscription proceeds for the minimum 40 units as part of the offering of Vidiation, LLC securities.

59.     On March 2, 2008, Mr. O'Connor's executive assistant sent Mr. Drukier a subscription agreement for Vidiation LLC by facsimile.  The subscription agreement was for 200,000 shares of common stock of Vidiation, LLC in exchange for $100,000, which were to be issued under the terms and conditions of a February 1, 2007 Confidential Private Placement Memorandum (the "February 2007 PPM").  According to the subscription agreement, $50,000 of the $100,000 would be used for working capital and the balance would be deposited in a separate account.  The subscription agreement had a retroactive date of March 31, 2007.

60.     At some point in the week following February 22, 2008, Mr. Drukier learned that AFR had announced the termination of its agreement with Vidiation, LLC and Vidiation, Inc. regarding the development of the radiation detection technology.  He also learned that AFR had announced the offer of its patent-pending radiation detection technology for sale or license.

61.     News of AFR's termination of its agreement with Vidiation, LLC and Vidiation, Inc. was reported in a trade publication on February 22, 2008.

62.     Upon learning about the termination of AFR's contract, Mr. Drukier wrote a letter to Mr. O'Connor dated March 4, 2008 and demanded Idler's $100,000 be returned with interest.

63.     Receiving no response to his March 4, 2008 letter, Mr. Drukier wrote another letter to Mr. O'Connor dated March 7, 2008. He once more requested that Idler's $100,000 check be returned with interest.

64.     Neither Vidiation, Inc. nor Mr. O'Connor responded to Mr. Drukier's March 4 or March 7, 2008 letter.

65.     On March 19, 2008, AFR announced that Vidiation, LLC had terminated its agreement with AFR for the development and licensing of AFR's software related to the radiation detection technology. Two reasons were reported for the termination. First, that Vidiation, LLC had recently entered into a cross-selling and licensing agreement with Splinternet. And, second, that Vidiation, LLC did not raise the amount of money for the development of the radiation detection technology that was required under the terms of Vidiation, LLC's agreement with AFR.

66.     After several weeks of silence on the part of Vidiation, LLC and Vidiation, Inc., Mr. O'Connor finally spoke with Mr. Drukier by telephone on April 1, 2008, and followed the conversation with a letter to Mr. Drukier dated April 1, 2008. During the conversation, Mr. O'Connor told Mr. Drukier among other things that Vidiation Inc. was contemplating a merger with a subsidiary of Splinternet Holdings, Inc.

67.     Mr. O'Connor's April 1, 2008 letter began with an "outline of your current investment position and the possible net results you may want to consider in the decision to

convert your Vidiation, LLC shares to Vidiation, Inc. shares and maintain your investment through, and consent to, the proposed merge [sic] with Splinternet Holdings, Inc."

68.     In the April 1, 2008 letter, Mr. O'Connor stated that Idler's original investment was for $100,000, and that it had received 80,000 shares of Vidiation, LLC in 2007.  He also stated that to convert to Vidiation, Inc. shares, Idler would need to sign a Vidiation, Inc. subscription agreement, and to sign a form consenting to the share exchange.

69.     On April 2, 2008, Splinternet publicly announced plans to acquire "Vidiation."

70.     On April 3, 2008, Mr. Drukier received an email from Vidiation, Inc. requesting Idler to complete a shareholder's written consent to the merger transaction.  The e-mail stated that "[a]lthough your signed Consent does not ensure that the merger will occur, it is a necessary step in the preparation for a close."

71.     No information was provided to Idler regarding Splinternet or the proposed merger.

72.     On April 30, 2008, Splinternet completed its acquisition of Vidiation, Inc.  As part of the transaction, Splinternet had formed Splinternet Merger Sub 1, Inc. as a wholly-owned subsidiary of Splinternet for the purpose of the merger.  At closing, Splinternet Merger Sub 1, Inc. merged with and into Vidiation, Inc., as a result of which Vidiation, Inc. became a wholly-owned subsidiary of Splinternet.

73.     In connection with the merger, Splinternet issued an aggregate of 4,788,179 shares of Splinternet common stock to the shareholders of Vidiation, Inc. in exchange for the then-outstanding shares of Vidiation, Inc.

74.     On May 5, 2008, Mr. Drukier on Idler's behalf wrote to Mr. O'Connor and requested that Mr. O'Connor "[p]lease advise the precise date my cheque for $100,000, plus interest, will be in my hands."

75.     Nobody from Vidiation, LLC, Vidiation, Inc., or Splinternet responded to Mr. Drukier's May 5, 2008 letter in writing.

76.     Nonetheless, Mr. Drukier had several conversations with Mr. O'Connor in the period between March and April, 2008 in which Mr. Drukier insisted on a full refund. Each time, Mr. O'Connor offered various excuses, or incomplete and inappropriate promises, including that: (1) Idler could take a capital loss of about $96,000 as described in the draft Form K-1 statements; (2) even though Mr. O'Connor was "stone broke," a friend of Mr. O'Connor's would reimburse Mr. Drukier and would buy Idler's shares (Mr. O'Connor later called to say that the person had changed his mind); (3) Mr. O'Connor would give Mr. Drukier a personal promissory note, to which Mr. Drukier agreed subject to a bank guarantee though Mr. O'Connor never followed through on this promise; and (4) Mr. O'Connor would remove Idler's shares from the eighteen-month "lock up," which was described in the February 2007 PPM, so that Idler could sell them.

77.     During one of these conversations, which occurred within days of the April 30, 2008 closing, Mr. Drukier stated that because Idler's subscription money was in escrow, Mr. O'Connor was in breach of the escrow agreement. Mr. O'Connor responded that Idler had approved the release of the escrow money, which statement was untrue because neither Mr. Drukier nor Idler had ever approved the release of Idler's subscription check from escrow.

78.     During this or another telephone conversation, which occurred within days of the April 30, 2008 closing, Mr. Drukier asked Mr. O'Connor what he did with Idler's money.

Mr. O'Connor responded that they spent the money. Mr. Drukier said that they were not supposed to spend it. Mr. O'Connor responded that Mr. Drukier had signed a release. Mr. Drukier demanded that Mr. O'Connor provide him with a copy of the so-called release.

79.    Until this point, Mr. Drukier believed that Idler's money was being held in an escrow account as described in the February 2007 PPM and Mr. Drukier's conversations with Mr. O'Connor.

80.    Neither Vidiation, LLC nor Mr. O'Connor had any intention of depositing Idler's subscription monies into escrow, and maintaining such monies in escrow, as described in the February 2007 PPM.

81.    If Idler's check had been held in a special non-interest bearing escrow account at Signature Bank (the escrow agent), as represented by Mr. O'Connor and in the February 2007 PPM, and relied upon by Mr. Drukier, the escrow agent would have been obligated to return Idler's check because the Vidiation, LLC offering failed to meet the minimum subscription level of 40 units.

82.    Idler next attempted to obtain a return of its monies on January 30, 2009 in a letter from its counsel to Mr. Ackerly as President and CEO of Splinternet and Mr. O'Connor as President and CEO of Vidiation, Inc.. The January 30, 2009 letter specifically demanded that Idler's subscription monies be returned.

83.    Neither Splinternet nor Vidiation, Inc. responded to the January 30, 2009 letter.

84.    On April 24, 2009, Idler sent a final notice to Vidiation and Splinternet indicating its election to void the sale of securities to it. A copy of this notice, which was sent pursuant to the Illinois Securities Law of 1953, is attached hereto as Exhibit B.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**by Vidiation, LLC**

85.     Plaintiff repeats and realleges Paragraphs 1 to 84 as if fully set forth herein.

86.     At all relevant times, Defendant Vidiation, LLC intended to and did deceive, manipulate, and defraud Plaintiff, as alleged herein, into sending a check to it so that it could pay off its outstanding debts, without any intention of holding such check until signed subscription documents were submitted by Idler or depositing the funds in escrow as described in the February 2007 PPM.

87.     As alleged herein, in connection with the sale of Vidiation, LLC shares, Defendant Vidiation, LLC, directly or indirectly, by use of means or instrumentalities of interstate commerce, including the use of the mails:  (1) made materially untrue statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (2) engaged in acts, practices, and a course of business that operated or would operate as a fraud or deceit upon any person.

88.     As alleged herein, Defendant Vidiation, LLC, directly or indirectly, used the mails, facsimiles, emails, and telephone conversations to perpetuate its intended deception, manipulation, and defrauding of Plaintiff by, among other things:  (1) failing to comply with its statements to Mr. Drukier that his check would be held until signed subscription documents were received by Vidiation LLC; (2) failing to comply with the provisions of the February 2007 PPM stating that subscription funds would be held in escrow pending completion of the offering; (3) using the proceeds from the Vidiation, LLC offering to make distributions to Mr. O'Connor and to pay off existing debt, not to fund research and development, in direct contravention of the statements in the February 2007 PPM; (4) otherwise misapplying the funds

raised in connection with the Vidiation, LLC offering; and (5) improperly extending the termination date of the Vidiation, LLC offering without notice to, or consent of, subscribers.

89. Vidiation, LLC further deceived, defrauded, and manipulated Idler by failing to provide it with any updated or revised versions of the February 2007 PPM.

90. Unbeknownst to Idler and Mr. Drukier, Vidiation, LLC distributed another version of a Confidential Private Placement Memorandum dated May 15, 2007 for an offering of up to $4 million for up to 80 units of Vidiation, LLC, each unit consisting of 40,000 shares of "common stock" (the "May 2007 PPM").

91. The May 2007 PPM differed in several material respects from the February 2007 PPM.

92. First, it provided for an offering termination date about a year after the original offering termination date set forth in the February 2007 PPM, and without notice to, or consent of, the subscribers.

93. Second, it stated that the amount owed to AFR for license and patent rights was $350,000 instead of the $500,000 represented in the February 2007 PPM.

94. Third, it disclosed that Vidiation, LLC intended to pursue a merger with a publicly-traded shell company. It disclosed that one of the risks for existing Vidiation, LLC shareholders was that the Vidiation, LLC shareholders would not be able to sell their shares, while the shareholders of the public shell company would not be so restricted and thus would have the ability to sell their shares in the public shell company.

95. Fourth, and most significantly, it contained additional subscriber withdrawal rights that were not included in the February 2007 PPM. In a new section entitled "Withdrawal Rights," Vidiation, LLC represented that it had agreed to supplement the May 2007 PPM with

additional information concerning the public shell company with which it was pursuing a merger.

96.     In capital letters, the May 2007 PPM represented that "ALL SUBSCRIBERS WILL HAVE AN OPPORTUNITY TO WITHDRAW THEIR SUBSCRIPTION, WITHOUT SETOFF OR DEDUCTION AT ANY TIME UNTIL THEY HAVE RECEIVED SUCH SUPPLEMENT, AND HAVE RECONFIRMED THEIR SUBSCRIPTION BY EXECUTING A SECURITIES PURCHASE AGREEMENT COVERING THE UNITS SUBSCRIBED FOR."

97.     The May 2007 PPM next represented—in capital letters that were bold and underlined—"**IF A SUBSCRIBER DOES NOT EXECUTE A SECURITIES PURCHASE AGREEMENT FOLLOWING RECEIPT OF THE SUPPLEMENT TO THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, ITS FUNDS SHALL BE WITHDRAWN FROM ESCROW AND RETURNED TO THE SUBSCRIBERS.**"

98.     By failing to provide Idler with the May 2007 PPM, Vidiation, LLC omitted to provide Idler with material information regarding its withdrawal rights, and therefore deprived Idler of the ability to exercise such withdrawal rights.

99.     At the time of the misrepresentations and omissions alleged herein, Idler did not know or have reason to know that such statements were false and believed them to be true.

100.    Had Idler known the truth about the misrepresentations and omissions, it would not have sent the $100,000 check to Vidiation, LLC.

101.    Based on the foregoing allegations, Defendant Vidiation, LLC violated § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder.

102.     As a direct and proximate cause of Defendant Vidiation, LLC's wrongful conduct, Plaintiff has suffered damages in connection with its purchase of Vidiation, LLC shares.

103.     This action was filed within two years of discovery of the fraud, and within five years of Plaintiff's purchase of the securities giving rise to the cause of action.

### COUNT II
### Liability of Frank O'Connor and James Ackerly
### Individually and As Controlling Persons under Section 20 of the Exchange Act

104.     Plaintiff repeats and realleges Paragraphs 1 to 103 as if fully set forth herein.

105.     Defendants O'Connor and Ackerly were directors and officers of Vidiation, LLC, and acted as controlling persons of Vidiation, LLC within the meaning of § 20 of the Exchange Act (15 U.S.C. § 78t) as alleged herein.

106.     By virtue of their executive positions, direct or indirect ownership of Vidiation, LLC, agency, participation in Vidiation, LLC's operations, and knowledge of the information contained in Vidiation, LLC's offering materials, Defendants O'Connor and Ackerly had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vidiation, LLC, including the content and dissemination of the statements alleged herein that Plaintiff contends are false and/or misleading.

107.     Defendants O'Connor and Ackerly were provided with and had unlimited access to the offering materials or other statements alleged by Plaintiff to have been false and/or misleading before and shortly after these offering materials or other statements were issued, and had the ability to prevent the issuance of these offering materials or other statements, or to cause the offering materials or other statements to be corrected.

108.    As described above, Defendants O'Connor and Ackerly violated § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder by their acts and omissions alleged herein.

109.    By virtue of their positions as controlling persons of Vidiation LLC, Defendants O'Connor and Ackerly are jointly and severally liable under § 20 of the Exchange Act (15 U.S.C. § 78t) for the violations by Vidiation LLC of § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder.

110.    As a direct and proximate cause of the wrongful conduct of Defendants O'Connor and Ackerly, Plaintiff has suffered damages.

111.    This action was filed within two years of discovery of the fraud, and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

### COUNT III
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### by Vidiation, Inc.

112.    Plaintiff repeats and realleges Paragraphs 1 to 111 as if fully set forth herein.

113.    As described above, Plaintiff's shares in Vidiation, LLC were converted into shares of common stock of Vidiation, Inc.  As a result, Plaintiff was and is entitled to at least 80,000, if not 200,000, shares of Vidiation, Inc. common stock.

114.    At all relevant times, Defendant Vidiation, Inc. intended to and did deceive, manipulate, and defraud Plaintiff, as alleged herein, into converting its Vidiation, LLC shares into Vidiation, Inc. shares.

115.    As alleged herein, in connection with the sale of Vidiation, Inc. shares, Defendant Vidiation, Inc., directly or indirectly, by use of means or instrumentalities of interstate commerce, including the use of the mails:  (1) made materially untrue statements and

omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (2) engaged in acts, practices, and a course of business that operated or would operate as a fraud or deceit upon any person.

116. As alleged herein, Defendant Vidiation, Inc., directly or indirectly, used the mails, facsimiles, emails, and telephone conversations to perpetuate its intended deception, manipulation, and defrauding of Plaintiff by, among other things: (1) failing to provide any offering materials or financial statements of Vidiation, Inc. in connection with the conversion of the Vidiation, LLC shares into Vidiation, Inc. shares; (2) failing to inform Plaintiff of its withdrawal rights; and (3) failing to honor Plaintiff's request for a return of its $100,000.

117. At the time of the misrepresentations and omissions alleged herein, Idler did not know or have reason to know that such statements were false and believed them to be true.

118. Had Idler known the truth about the misrepresentations and omissions, it would have sued to enjoin the conversion, exercised its withdrawal rights, or exercised other rights and remedies available to it.

119. Based on the foregoing allegations, Defendant Vidiation, Inc. violated § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder.

120. As a direct and proximate cause of Defendant Vidiation, Inc.'s wrongful conduct, Plaintiff has suffered damages in connection with its purchase of shares of Vidiation, Inc. common stock.

121. This action was filed within two years of discovery of the fraud, and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

**COUNT IV**
**Liability of Frank O'Connor and James Ackerly**
**Individually and As Controlling Persons under Section 20 of the Exchange Act**

122.    Plaintiff repeats and realleges Paragraphs 1 to 121 as if fully set forth herein.

123.    Defendants O'Connor and Ackerly were directors and officers of Vidiation, Inc., and acted as controlling persons of Vidiation, Inc. within the meaning of § 20 of the Exchange Act (15 U.S.C. § 78t) as alleged herein.

124.    By virtue of their executive positions, direct or indirect ownership of Vidiation, Inc., agency, and participation in Vidiation, Inc.'s operations, Defendants O'Connor and Ackerly had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Vidiation, Inc., including the content and dissemination of the statements alleged herein that Plaintiff contends are false and/or misleading.

125.    Defendants O'Connor and Ackerly were provided with and had unlimited access to the offering materials and other statements alleged by Plaintiff to have been false and/or misleading before and shortly after these offering materials and other statements were issued, and had the ability to prevent the issuance of these offering materials and other statements, or to cause the offering materials and other statements to be corrected.

126.    As described above, Defendants O'Connor and Ackerly violated § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder by their acts and omissions alleged herein.

127.    By virtue of their positions as controlling persons of Vidiation Inc., Defendants O'Connor and Ackerly are jointly and severally liable under § 20 of the Exchange Act (15 U.S.C. § 78t) for the violations by Vidiation Inc. of § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder.

128.     As a direct and proximate cause of the wrongful conduct of Defendants

O'Connor and Ackerly, Plaintiff has suffered damages.

129.     This action was filed within two years of discovery of the fraud, and within five

years of Plaintiff's purchase of securities giving rise to the cause of action.

### COUNT V
### Violation of Section 12(a)(1) of the Securities Act
### by Vidiation, Inc. and Vidiation, LLC

130.     Plaintiff repeats and realleges Paragraphs 1 to 129 as if fully set forth herein.

131.     The offerings and sales of Vidiation securities were in violation of § 5 of the

Securities Act (15 U.S.C. § 77e) because no registration statements were filed with the SEC,

and the offerings and sales of the securities did not meet the requirements of any available

exemption from registration.

132.     According to the terms of the offerings, the Vidiation securities were offered

and sold in reliance on the exemption from registration set forth in § 4(2) of the Securities Act

(15 U.S.C. § 77d) and Regulation D under the Securities Act (17 C.F.R. §§ 230.501-230.508).

133.     The offerings of Vidiation securities did not qualify for exemption under § 4(2)

of the Securities Act (15 U.S.C. § 77d), among other reasons, because Vidiation did not furnish

Idler with the type of information that would be contained in a registration statement or have

access to such information.

134.     The offerings of Vidiation securities did not qualify for exemption under Rules

505 or 506 of Regulation D, because, among other reasons:  (1) Idler was not an accredited

investor within the meaning of Regulation D, because it did not have total assets in excess of

$5,000,000 and it is not an entity in which all of the equity owners are accredited investors; and

(2) Idler did not receive the information required to be furnished under Regulation D.

135.     As alleged herein, because Vidiation, LLC and Vidiation, Inc. offered and sold securities in violation of § 5 of the Securities Act (15 U.S.C. § 77e), Vidiation, LLC and Vidiation, Inc. are liable under § 12(a)(1) of the Securities Act (15 U.S.C. § 77l).

136.     Vidiation, LLC and Vidiation, Inc. used the mails, or facilities for interstate transportation or communications, in offering and selling their respective securities.

137.     Vidiation, LLC and Vidiation, Inc. defrauded and deceived Idler by representing that they would deliver to Idler the securities that were offered and sold to it.

138.     To date, Vidiation, LLC and Vidiation, Inc. have not delivered to Idler the securities that were offered and sold to it.

139.     This action was brought within one year after the violation upon which it is based, and no more than three years after the securities were bona fide offered to the public.

## COUNT VI
### Liability of Frank O'Connor and James Ackerly
### Under Section 15 of the Securities Act

140.     Plaintiff repeats and realleges Paragraphs 1 to 139 as if fully set forth herein.

141.     Defendants O'Connor and Ackerly were directors and officers of Vidiation, LLC and Vidiation, Inc., and acted as controlling persons of Vidiation LLC and Vidiation, Inc. within the meaning of § 15 of the Securities Act (15 U.S.C. § 77o) as alleged herein.

142.     By virtue of their executive positions, direct or indirect ownership of Vidiation LLC and Vidiation, Inc., agency, and participation in Vidiation LLC and Vidiation, Inc. operations, Defendants O'Connor and Ackerly had the power to influence and control, and did influence and control, directly or indirectly, the offerings of Vidiation LLC and Vidiation, Inc. securities in violation of § 5 of the Securities Act (15 U.S.C. § 77e), and thus the violation of § 12(a)(1) of the Securities Act (15 U.S.C. § 77l).

143.    By virtue of their positions as controlling persons of Vidiation LLC and

Vidiation, Inc., Defendants O'Connor and Ackerly are jointly and severally liable under § 15 of

the Securities Act (15 U.S.C. § 77o) for the violation of § 12(a)(1) by Vidiation LLC and

Vidiation, Inc.

144.    As a direct and proximate cause of the wrongful conduct of Defendants

O'Connor and Ackerly, Plaintiff has suffered damages.

145.    This action was brought within four years after the cause of action accrued.

**COUNT VII**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**by Splinternet**

146.    Plaintiff repeats and realleges Paragraphs 1 to 145 as if fully set forth herein.

147.    Plaintiff's shares in Vidiation, Inc. common stock were converted into shares of

Splinternet common stock in connection with the merger involving a wholly-owned subsidiary

of Splinternet and Vidiation, Inc.  As a result, Plaintiff was and is entitled to at least 80,000, if

not 200,000, shares of Splinternet common stock.

148.    Pursuant to the Delaware General Corporation Law, the solicitation by

Vidiation, Inc. of shareholder consents to the merger involving Vidiation, Inc. and a wholly-

owned subsidiary of Splinternet constituted an offer to sell the securities of Splinternet in

connection with such merger, because the agreement and plan of merger involved the exchange

of Vidiation common stock for the common stock of Splinternet.

149.    At all relevant times, Defendant Splinternet intended to and did deceive,

manipulate, and defraud Plaintiff, as alleged herein, into converting its shares of Vidiation, Inc.

common stock into shares of Splinternet common stock.

150.     As alleged herein, in connection with the offering of shares of Splinternet common stock, Defendant Splinternet, directly or indirectly, by use of means or instrumentalities of interstate commerce, including the use of the mails:  (1) made materially untrue statements and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (2) engaged in acts, practices, and a course of business that operated or would operate as a fraud or deceit upon any person.

151.     As alleged herein, Defendant Splinternet, directly or indirectly, used the mails, facsimiles, emails, and telephone conversations to perpetuate its intended deception, manipulation, and defrauding of Plaintiff by, among other things:  (1) failing to describe the terms of the merger; (2) failing to describe or otherwise provide information on the business, management, and operations of Splinternet; (3) failing to provide financial statements of Splinternet and Vidiation, Inc.; (4) failing to inform Plaintiff of its statutory appraisal rights under § 262 of the Delaware General Corporation Law (Del. Code Ann. tit. 8, § 262); and (5) offering shares of Splinternet common stock in exchange for shares of Vidiation, Inc. common stock when the shares of Vidiation, Inc. common stock were improperly and unlawfully issued.

152.     At the time of the misrepresentations and omissions alleged herein, Idler did not know or have reason to know that such statements were false and believed them to be true.

153.     Had Idler known the truth about the misrepresentations and omissions, it would have sued to enjoin the merger, exercise its appraisal rights, or exercised other rights and remedies available to it.

154.     Based on the foregoing allegations, Defendant Splinternet violated § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder.

155.     As a direct and proximate cause of Defendant Splinternet's wrongful conduct, Plaintiff has suffered damages.

156.     This action was filed within two years of discovery of the fraud, and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

**COUNT VIII**
**Liability of Frank O'Connor and James Ackerly**
**Individually and As Controlling Persons under Section 20 of the Exchange Act**

157.     Plaintiff repeats and realleges Paragraphs 1 to 156 as if fully set forth herein.

158.     Defendants O'Connor and Ackerly were directors and officers of Splinternet, and acted as controlling persons of Splinternet within the meaning of § 20 of the Exchange Act (15 U.S.C. § 78t) as alleged herein.

159.     By virtue of their executive positions, direct or indirect ownership of Splinternet, agency, participation in Splinternet's operations, Defendants O'Connor and Ackerly had the power to influence and control, and did influence and control, directly or indirectly, the offering of Splinternet securities and the decision-making of Splinternet, including the content and dissemination of the statements alleged herein that Plaintiff contends are false, misleading, and/or which were omitted.

160.     Defendants O'Connor and Ackerly were provided with and had unlimited access to the information and statements alleged by Plaintiff to have been false, misleading, and/or omitted before and shortly after the offering, and had the ability to prevent the issuance of these statements, to cause the statements to be corrected, or to provide statement or information that had been omitted.

161.     As described above, Defendants O'Connor and Ackerly violated § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 promulgated thereunder by their acts and omissions alleged herein.

162.     By virtue of their positions as controlling persons of Splinternet, Defendants

O'Connor and Ackerly are jointly and severally liable under § 20 of the Exchange Act (15

U.S.C. § 78t) for the violations by Splinternet of § 10(b) of the Exchange Act (15 U.S.C. § 78j)

and Rule 10b-5 promulgated thereunder.

163.     As a direct and proximate cause of the wrongful conduct of Defendants

O'Connor and Ackerly, Plaintiff has suffered damages.

164.     This action was filed within two years of discovery of the fraud, and within five

years of Plaintiff's purchase of securities giving rise to the cause of action.

**COUNT IX**
**Violation of Section 12(a)(1) of the Securities Act**
**by Splinternet**

165.     Plaintiff repeats and realleges Paragraphs 1 to 164 as if fully set forth herein.

166.     For purposes of this count alone, Plaintiff affirmatively states that it does not

claim that Splinternet acted intentionally or recklessly, with scienter, or with fraudulent intent.

167.     Pursuant to the Delaware General Corporation Law, the solicitation by

Vidiation, Inc. of shareholder consents to the merger involving Vidiation, Inc. and a wholly-

owned subsidiary of Splinternet constituted an offer to sell the securities of Splinternet in

connection with such merger, because the agreement and plan of merger involved the exchange

of Vidiation common stock for the common stock of Splinternet.

168.     The offering and sale of Splinternet securities were in violation of § 5 of the

Securities Act (15 U.S.C. § 77e) because no registration statement was filed with the SEC, and

the offering and sale of the securities did not meet the requirements of any available exemption

from registration.

169.     As alleged herein, because Splinternet offered and sold securities in violation of § 5 of the Securities Act (15 U.S.C. § 77e), Splinternet is liable under § 12(a)(1) of the Securities Act (15 U.S.C. § 77l).

170.     In distributing the Splinternet common stock in connection with the merger Splinternet used the mails, or facilities for interstate transportation or communications.

171.     To date, Splinternet has not delivered to Idler the shares of Splinternet common stock issued and sold to Idler in connection with the merger.

172.     This action was brought within one year after the violation upon which it is based, and no more than three years after the securities were bona fide offered to the public.

### COUNT X
### Liability of Frank O'Connor and James Ackerly
### Under Section 15 of the Securities Act

173.     Plaintiff repeats and realleges Paragraphs 1 to 172 as if fully set forth herein.

174.     Defendants O'Connor and Ackerly were directors and officers of Splinternet, and acted as controlling persons of Splinternet within the meaning of § 15 of the Securities Act (15 U.S.C. § 77o) as alleged herein.

175.     By virtue of their executive positions, direct or indirect ownership of Splinternet, agency, and participation in Splinternet's operations, Defendants O'Connor and Ackerly had the power to influence and control, and did influence and control, directly or indirectly, the offering of Splinternet securities in violation of § 5 of the Securities Act (15 U.S.C. § 77e), and thus the violation of § 12(a)(1) of the Securities Act (15 U.S.C. § 77l).

176.     By virtue of their positions as controlling persons of Splinternet, Defendants O'Connor and Ackerly are jointly and severally liable under § 15 of the Securities Act (15 U.S.C. § 77o) for the violation of § 12(a)(1) by Splinternet.

177. As a direct and proximate cause of the wrongful conduct of Defendants O'Connor and Ackerly, Plaintiff has suffered damages.

178. This action was brought within four years after the cause of action accrued.

## COUNT XI
### Breach of Contract
### by Vidiation, LLC, Vidiation, Inc., and Splinternet

179. Plaintiff repeats and realleges Paragraphs 1 to 178 as if fully set forth herein.

180. As alleged above, Plaintiff Idler entered into a contract with Vidiation, LLC for the purchase of 80,000 shares (2 units) of Vidiation, LLC common stock in exchange for $100,000. Splinternet and Vidiation, Inc. are liable for the obligations of Vidiation, LLC under this contract as successors in interest and alter egos of Vidiation, LLC and by virtue of the actual and/or implied assumption of the contractual obligations of Vidiation, LLC in connection with the merger of Vidiation, LLC with and into the subsidiary of Splinternet.

181. As part of the agreement, Vidiation, LLC and Mr. O'Connor were obligated to hold Idler's funds in escrow until Vidiation, LLC had received and accepted a minimum of 40 units by the termination date set forth in the February 2007 PPM. If the minimum offering was not met by such termination date, Vidiation, LLC was required to instruct the escrow agent to return to subscribers their full subscription amounts.

182. Vidiation, LLC, Vidiation, Inc., and Splinternet breached the agreement by failing to: (1) hold and maintain Idler's subscription monies in escrow; (2) return to Idler its full subscription amount after the minimum offering of Vidiation, LLC units was not received and accepted by the termination date; and (3) deliver to Idler the securities it purchased in exchange for $100,000.

183.     Idler has performed all obligations on its part to be performed under the agreement.

184.     As a direct and proximate cause of the breach of contract by Vidiation, LLC, Vidiation, Inc., and Splinternet, Plaintiff has suffered damages.

## COUNT XII
### Rescission Action
### by Vidiation, LLC, Vidiation, Inc., and Splinternet

185.     Plaintiff repeats and realleges Paragraphs 1 to 184 as if fully set forth herein.

186.     Defendants Vidiation, LLC, Vidiation, Inc., and Splinternet engaged in a scheme to induce Plaintiff to invest in shares of Vidiation, LLC common stock, to exchange its shares of Vidiation, LLC common stock for shares of Vidiation, Inc. common stock, and to exchange its shares of Vidiation, Inc. common stock for shares of Splinternet common stock.

187.     As alleged above, Defendants Vidiation, LLC, Vidiation, Inc., and Splinternet made numerous materially false misrepresentations in connection with the sale or exchange of each of their respective securities.

188.     As a prospective purchaser, Plaintiff had a right to rely, and did rely, on the materially false misrepresentations of Defendants Vidiation, LLC, Vidiation, Inc., and Splinternet in connection with Idler's purchase or exchange of each of their respective securities.

189.     If Defendants Vidiation, LLC, Vidiation, Inc., and Splinternet had not engaged in acts, practices, and a course of business that operated or would operate as a fraud or deceit upon Plaintiff, or had not made materially false misrepresentations, Plaintiff would not have bought shares of Vidiation, LLC common stock, exchanged its shares of Vidiation, LLC

common stock for shares of Vidiation, Inc. common stock, or exchanged its shares of Vidiation, Inc. common stock for shares of Splinternet common stock.

190.     Plaintiff seeks rescission of the purchase of the shares of Vidiation, LLC common stock, the exchange of the shares of Vidiation, LLC common stock for shares of Vidiation, Inc. common stock, and the exchange of the shares of Vidiation, Inc. common stock for shares of Splinternet common stock.

## COUNT XIII
### Fraud
### by Vidiation, LLC, Vidiation, Inc., and Splinternet

191.     Plaintiff repeats and realleges Paragraphs 1 to 190 as if fully set forth herein.

192.     All Defendants were engaged in a common scheme, and conspired, to defraud Idler.

193.     As described more fully above, Vidiation, LLC, Vidiation, Inc., and Splinternet knowingly, intentionally, and fraudulently made false statements of fact, or omitted certain facts, in connection with the offerings of Vidiation, LLC, Vidiation, Inc., and Splinternet securities.

194.     The false statements were untrue and were known to be untrue by Vidiation, LLC, Vidiation, Inc., and Splinternet at the time that they were made.

195.     Vidiation, LLC, Vidiation, Inc., and Splinternet were aware of the fraudulent omissions based on inside information not generally known to Idler or the public.

196.     The false statements were made, and the fraudulent omissions were concealed from Idler, by Vidiation, LLC, Vidiation, Inc., and Splinternet with a reckless indifference to the rights of Idler, or with an intentional and wanton violation of the rights of Idler.

197.     The false statements and omissions were made by Vidiation, LLC, Vidiation, Inc., and Splinternet with the intent of inducing Idler to rely on the false statements in order to purchase securities of Vidiation, LLC, Vidiation, Inc., and Splinternet.

198.     Idler relied on the false statements to its detriment by purchasing securities of Vidiation, LLC, Vidiation, Inc., and Splinternet.

199.     Vidiation, LLC, Vidiation, Inc., and Splinternet knew that if Idler had known about the fraudulent omissions, Idler would not have purchased securities of Vidiation, LLC, Vidiation, Inc., and Splinternet.

200.     Idler has been damaged as a result of the wrongful conduct of Vidiation, LLC, Vidiation, Inc., and Splinternet.

## COUNT XIV
### Unjust Enrichment
### by Vidiation, LLC, Vidiation, Inc., and Splinternet

201.     Plaintiff repeats and realleges Paragraphs 1 to 200 as if fully set forth herein.

202.     As an alternative count, Plaintiff asserts a claim of unjust enrichment against Defendants Vidiation, LLC, Vidiation, Inc., and Splinternet in connection with their scheme to induce Plaintiff to invest in shares of Vidiation, LLC common stock, to exchange its shares of Vidiation, LLC common stock for shares of Vidiation, Inc. common stock, and to exchange its shares of Vidiation, Inc. common stock for shares of Splinternet common stock.

203.     Defendant Vidiation, LLC received a benefit from Plaintiff when it deposited Plaintiff's $100,000 check.  Defendant Vidiation, Inc. in turn benefitted from Plaintiff's $100,000 investment when the shares of Vidiation, LLC common stock were exchanged for shares of Vidiation, Inc. common stock.  Finally, Defendant Splinternet benefitted from Plaintiff's $100,000 investment in connection with the merger involving one of its wholly-

owned subsidiaries and Vidiation, Inc., and the exchange of shares of Vidiation, Inc. common stock for shares of Splinternet common stock. Vidiation, LLC, Vidiation, Inc., and Splinternet also all benefitted from their fraudulent scheme by diverting Plaintiff's investment money to their own personal use.

204.     Vidiation, LLC, Vidiation, Inc., and Splinternet unjustly failed to provide Plaintiff with the benefit of Plaintiff's agreed-upon investment by providing Plaintiff with securities in each respective company in exchange for Plaintiff's subscription check.

205.     For purposes of this alternative count only, Plaintiff alleges that it has no adequate remedy at law.

**COUNT XV**
**Violation of the Illinois Securities Law of 1953**
**by All Defendants**

206.     Plaintiff repeats and realleges Paragraphs 1 to 205 as if fully set forth herein.

207.     All Defendants named in this claim are either principal violators or controlling persons of Defendants Vidiation, LLC, Vidiation, Inc., and Splinternet, by virtue of their executive positions as directors and officers; direct or indirect respective ownership of Vidiation, LLC, Vidiation, Inc., and Splinternet; agency; participation in the operations of Vidiation, LLC, Vidiation, Inc., and Splinternet; and their power to, and actual, influence and control over, directly or indirectly, the respective securities offerings and the decision-making of Vidiation, LLC, Vidiation, Inc., and Splinternet, including the content and dissemination of the statements alleged herein that Plaintiff contends are false, misleading, and/or which were omitted.

208. In connection with the offerings and/or sales of the securities of Vidiation, LLC, Vidiation, Inc., and Splinternet, Defendants engaged in a transaction, practice, or course of business that worked or tended to work a fraud or deceit upon Plaintiff.

209. To obtain Plaintiff's money through the sale of the securities of Vidiation, LLC, Vidiation, Inc., and Splinternet, Defendants made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

210. Defendants Vidiation, LLC, O'Connor, and Ackerly knew, or had reasonable grounds to know, that the February 2007 PPM contained false or untrue material representations.

211. In connection with the offering and/or sale of the securities of Vidiation, LLC, Vidiation, Inc., and Splinternet, Defendants directly or indirectly employed a device, scheme, or artifice to defraud Plaintiff.

212. By virtue of the allegations made herein, Defendants violated Section 12 of the Illinois Securities Law of 1953 (815 ILCS 5/12).

213. Pursuant to 815 ILCS 5/13, Idler provided notice to Defendants Vidiation, LLC, Vidiation, Inc., and Splinternet, as well as to Defendants O'Connor and Ackerly, individually as controlling persons of Vidiation, LLC, Vidiation, Inc., and Splinternet, that Idler had elected to treat the sale of securities to it as voidable. (A copy of the statutory notice is attached hereto as Exhibit B.)

214. To date, Defendants have not made an offer to Idler to repurchase its securities for a price equal to the full amount paid thereon plus interest.

215. Pursuant to 815 ILCS 5/13, a copy of this Amended Complaint is being served on the Illinois Secretary of State.

216. This action was brought within six months after Idler had knowledge that the sale of securities to it was voidable, and within three years from the date of the sale of the securities.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment as follows:

a. Rescission;

b. Monetary damages;

c. Interest;

d. Costs and expenses incurred in connection with this action, including attorneys' fees and costs, and expert fees; and

e. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Trial by jury is hereby demanded as to all issues so triable.

Respectfully submitted,

PLAINTIFF THE IDLER COMPANY, INC.

By: /s/ Jill M. O'Toole
Jill M. O'Toole (Fed. Bar No. ct27116)
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel.: (860) 251-5000
Fax: (860) 251-5218
Email: jotoole@goodwin.com
Its Attorneys

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on May 21, 2009, a copy of the foregoing Amended Complaint was served via First Class, U.S. mail, postage prepaid, on the following:

J. Michael Sconyers
Ackerly Brown LLP
782 Bantam Road
P.O. Box 815
Bantam, CT 06750-0815
For Defendants Splinternet Holdings, Inc.
and Mr. James C. Ackerly

Vidiation, Inc., doing business as Defentect
535 Connecticut Avenue, Suite 201A
Norwalk, Connecticut 06854

Vidiation, LLC
830 West Main Street, Suite 345
Lake Zurich, Illinois 60047

Mr. Frank O'Connor
President and Chief Executive Officer
Vidiation, LLC
830 West Main Street, Suite 345
Lake Zurich, Illinois 60047

s/ Jill M. O'Toole

1108616v1